

# The University of the State of New York

## The State Education Department
### State Review Officer
www.sro.nysed.gov

No. 20-089

**Application of a STUDENT WITH A DISABILITY, by his parents, for review of a determination of a hearing officer relating to the provision of educational services by the New York City Department of Education**

**Appearances:**

Howard Friedman, Special Assistant Corporation Counsel, attorneys for respondent, by Jeni St. George, of counsel

## DECISION

### I. Introduction

This proceeding arises under the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400-1482) and Article 89 of the New York State Education Law. Petitioners (the parents) appeal from a decision of an impartial hearing officer (IHO) which found respondent's (the district's) Committee on Special Education (CSE) had failed to recommend an appropriate program for the student for the 2017-18, 2018-19, and 2019-20 school years.[1] The parents appeal from the IHO's failure to grant all of their requested relief. The district cross-appeals from the IHO's award of prospective tuition at Gersh Academy (Gersh) for the 2020-21 school year. The appeal must be sustained in part. The cross-appeal must be dismissed.

### II. Overview—Administrative Procedures

When a student in New York is eligible for special education services, the IDEA calls for the creation of an individualized education program (IEP), which is delegated to a local Committee on Special Education (CSE) that includes, but is not limited to, parents, teachers, a school psychologist, and a district representative (Educ. Law § 4402; see 20 U.S.C. § 1414[d][1][A]-[B]; 34 CFR 300.320, 300.321; 8 NYCRR 200.3, 200.4[d][2]). If disputes occur between parents and

---

[1] The parents appear pro se. However, it is noted that the student's father is an attorney and represented the parents at the hearing (Tr. pp. 10, 29, 121).

school districts, incorporated among the procedural protections is the opportunity to engage in mediation, present State complaints, and initiate an impartial due process hearing (20 U.S.C. §§ 1221e-3, 1415[e]-[f]; Educ. Law § 4404[1]; 34 CFR 300.151-300.152, 300.506, 300.511; 8 NYCRR 200.5[h]-[*l*]).

New York State has implemented a two-tiered system of administrative review to address disputed matters between parents and school districts regarding "any matter relating to the identification, evaluation or educational placement of a student with a disability, or a student suspected of having a disability, or the provision of a free appropriate public education to such student" (8 NYCRR 200.5[i][1]; see 20 U.S.C. § 1415[b][6]-[7]; 34 CFR 300.503[a][1]-[2], 300.507[a][1]). First, after an opportunity to engage in a resolution process, the parties appear at an impartial hearing conducted at the local level before an IHO (Educ. Law § 4404[1][a]; 8 NYCRR 200.5[j]). An IHO typically conducts a trial-type hearing regarding the matters in dispute in which the parties have the right to be accompanied and advised by counsel and certain other individuals with special knowledge or training; present evidence and confront, cross-examine, and compel the attendance of witnesses; prohibit the introduction of any evidence at the hearing that has not been disclosed five business days before the hearing; and obtain a verbatim record of the proceeding (20 U.S.C. § 1415[f][2][A], [h][1]-[3]; 34 CFR 300.512[a][1]-[4]; 8 NYCRR 200.5[j][3][v], [vii], [xii]). The IHO must render and transmit a final written decision in the matter to the parties not later than 45 days after the expiration period or adjusted period for the resolution process (34 CFR 300.510[b][2], [c], 300.515[a]; 8 NYCRR 200.5[j][5]). A party may seek a specific extension of time of the 45-day timeline, which the IHO may grant in accordance with State and federal regulations (34 CFR 300.515[c]; 8 NYCRR 200.5[j][5]). The decision of the IHO is binding upon both parties unless appealed (Educ. Law § 4404[1]).

A party aggrieved by the decision of an IHO may subsequently appeal to a State Review Officer (SRO) (Educ. Law § 4404[2]; see 20 U.S.C. § 1415[g][1]; 34 CFR 300.514[b][1]; 8 NYCRR 200.5[k]). The appealing party or parties must identify the findings, conclusions, and orders of the IHO with which they disagree and indicate the relief that they would like the SRO to grant (8 NYCRR 279.4). The opposing party is entitled to respond to an appeal or cross-appeal in an answer (8 NYCRR 279.5). The SRO conducts an impartial review of the IHO's findings, conclusions, and decision and is required to examine the entire hearing record; ensure that the procedures at the hearing were consistent with the requirements of due process; seek additional evidence if necessary; and render an independent decision based upon the hearing record (34 CFR 300.514[b][2]; 8 NYCRR 279.12[a]). The SRO must ensure that a final decision is reached in the review and that a copy of the decision is mailed to each of the parties not later than 30 days after the receipt of a request for a review, except that a party may seek a specific extension of time of the 30-day timeline, which the SRO may grant in accordance with State and federal regulations (34 CFR 300.515[b], [c]; 8 NYCRR 200.5[k][2]).

### III. Facts and Procedural History

Due to parental concerns regarding development, the student was evaluated through the Early Intervention Program (EIP) and at the age of two years, eight months was diagnosed with autism (Parent Exs. Y; HH at p. 1). The EIP evaluation determined that the student demonstrated delays in broad adaptive abilities as well as communication and socialization skills (Parent Ex. HH at p. 2). The student's overall cognitive ability could not be calculated due to the absence of speech

2

and responsiveness, although it was estimated to be between the extremely low and mild deficit range of functioning (id. at p. 1). Following the EIP evaluation, from June 2010 to August 2011, the student received 20 hours per week of ABA therapy as well as occupational therapy (OT), at home (id. at p. 2).

At the age of four, the student began receiving speech-language therapy and attended a private preschool where he reportedly made some progress (Parent Ex. HH at p. 2). For kindergarten, the student attended a district 75 school, where, per parent report, he regressed behaviorally (id. at p. 2).[2]

Beginning in second grade, the 2015-16 school year, through June 2019, the student attended school at the Association for Metroarea Autistic Children Inc. (AMAC), initially in a 6:1+3 classroom, which included students who were verbal (Parent Exs. P at p. 20; HH at p. 2; Dist. Ex. 4 at p. 1).[3, 4] The student received speech-language therapy and OT at AMAC, in addition to 1:1 home-based ABA services (Parent Exs. P at p. 20; EE at p. 1; Dist. Exs. 2 at p. 19; 5 at p. 1; 6 at p. 1).[5]

By letter dated January 22, 2018, the AMAC director notified the parents that the teacher in the student's classroom had resigned due to family medical reasons and was being replaced by a "Teacher Assistant (level 3)" (Parent Ex. I).[6]

---

[2] According to a May 13, 2019 neuropsychological evaluation report, the student's mother reported that during his kindergarten year the student's ABA was reduced to 20 hours per week, but does not indicate whether these services had been delivered at home or at school (Parent Ex. HH at p. 2). The parent also reported that during kindergarten the student often came home with his clothes soiled and the teachers referred to the student as "'unteachable'" (Parent Ex. HH at p. 2).

[3] The parents described AMAC as "a specialized ABA school" (Parent Ex. Y).

[4] On July 18, 2017, in an email to the director of elementary education at AMAC, the parent voiced concern that the student had been placed in a class with students who were unable to speak without prompting and further noted that the student spent half of his time ignoring the teacher and looking into space and paid attention only briefly when a teacher assistant nudged him or called him (Parent Ex. E). As such, the parent inquired as to "what class" AMAC could offer the student "containing children who speak" and also whether he could observe such a class (id.). The parent also requested that the teacher assistants interact more with the student to make him pay attention and participate in the class routine (id.). On July 25, 2017, the principal responded that in order to change the student's class ratio from his current 6:1+3 class, the CSE would need to meet and make the change on the student's IEP, although notwithstanding this, the school did not currently have an 8:1+2 class in the student's age range or functional level (Parent Ex. F). The parent replied that the school district, the student's doctor, and everyone agreed with and supported the student's transfer to a class that had peer models who spoke and that resolving the matter according to the recommendations of all concerned would avoid an unnecessary issue and solve a problem (id.).

[5] A May 21, 2019 evaluation of the student reflected that, at that time, the student received 20 hours of ABA services at home through his IEP (Parent Ex. EE at p. 1).

[6] In letter to the AMAC director also dated January 22, 2018, the parent indicated that he was troubled by December 2017 reports by the student's teacher and speech therapist which indicated the student had made "little progress" in several areas of his report card (Parent Ex. J). The parent indicated that despite their hard work and dedication, the student was not progressing satisfactorily and that the resignation of both of these providers served to worsen the

A Stipulation of Settlement dated February 9, 2018 was admitted into the hearing record settling the parents' claims related to a June 2017 due process complaint notice (Parent Ex. D).[7] As part of the settlement, the parties agreed that the parent would be reimbursed for 40 hours of speech-language services and services provided by Kumon Learning Center (Kumon), and that the district would fund 20 hours per week of home-based SETSS for the 2017-18 school year (Parent Ex. D at pp. 1-2).[8]

In a letter dated May 15, 2018, the student's mother informed the AMAC director that following the departure of three teachers over a short period of time, the student had demonstrated "marked regression of behavior" including new disruptive behavior that interrupted instruction (Parent Ex. M).[9]

## A. Due Process Complaint Notice

By due process complaint notice dated June 11, 2018, the parents asserted that the district failed to provide the student with an IEP for the 2018-19 school year (IHO Ex. I).[10] The parents argued that they were excluded from participation in the creation of the student's IEP for the 2018-19 school year (id. at p. 3). According to the due process complaint notice, the parents were not informed of decisions regarding the student's placement and AMAC did not have an appropriate class for the student (id.). The parents asserted that as of December 2017 the student's teacher at AMAC departed and the replacement teacher was unsatisfactory, further asserting that in violation of the student's IEP, AMAC did not have a certified teacher trained in ABA (id. at p. 2). Notably,

---

student's situation (id.). As such, he requested that AMAC permit a "licensed, highly qualified 1:1 Special Education Itinerant Teacher with a master's degree to visit AMAC and to teach [the student] 1:1 for ten hours per week" at no cost to the school (id.). The AMAC director responded the following day via email, indicating that the student had made a smooth transition to his new speech-language pathologist and that with regard to the parents' request, AMAC was unable to have someone from outside the school come in (Parent Ex. K). However, she indicated that she would double check with the CSE and continue to look for "outstanding certified teachers to join the AMAC team" (id.).

[7] The parties settled the parents claims regarding the 2017-18 school year raised in a June 16, 2017 due process complaint notice (Parent Ex. D at p. 1).

[8] Kumon is a tutoring service that the student received at home, which focused on math and reading (Tr. pp. 244-47).

[9] The third teacher, a classroom teacher, who had recently left the student's classroom was terminated for unsatisfactory performance (Parent Ex. M). The parent asserted that the student was not receiving the stability he required and that this stability could be provided by a certified ABA trained teacher who was trained on how to control behavior in order to help the student focus, learn, and progress smoothly (id.).

[10] It is noted that the due process complaint notice is incorrectly dated June 11, 2017 (IHO Ex. I at p. 1). It appears that the correct date was June 11, 2018 because the due process complaint notice contained factual allegations subsequent to June 11, 2017, including reference to a June 5, 2018 CSE meeting, and the parents' requested a finding regarding the 2018-19 school year (id. at pp. 1-3). In addition, the district acknowledged that these proceedings commenced with a due process complaint notice dated June 11, 2018 (Answer with Cross Appeal ¶ 7). While the due process complaint notice referenced a June 5, 2018 CSE meeting, it also indicated that the student's most recent IEP was dated August 24, 2016, which recommended a 12-month placement at AMAC (IHO Ex. I at p. 1). The hearing record does not include a June 2018 IEP.

4

the parents asserted that the student had four teachers over the first four months of the school year in 2018, and that this "unstable environment disrupted and interfered with [the student's] learning" (id.). Additionally, the parents asserted that the student was failing to achieve key goals in speech, that he needed "a classroom with children who speak," and that the student's classmates were "severely impaired and unsuitable as models for speech" (id. at pp. 1-2).

The parents further contended that the failure to provide an IEP for the student for the 2018-19 school year "deprived [the student] of a comprehensive statement of his individual needs, and specially designed instruction and related services" (IHO Ex. I at p. 3). The parents alleged that the student's "educational program omit[ted] evaluation criteria, a procedure to review each goal, a schedule for evaluations, and responsibility to measure each goal" (id.).

The parents contended that by not having a new IEP for the student, the district "in effect scheduled termination ... of 1:1 instruction [the student] ha[d] received continuously since 2010" and this act unilaterally changed the student's placement, without parental consent (IHO Ex. I at p. 1). The parents argued that the student's least restrictive environment was regular education with 1:1 instruction and that without "challenging regular education study materials to engage [the student]," the district and AMAC could not provide him with a FAPE (id.). According to the parents, the student was entitled to compensatory education due to "AMAC's lack of a certified teacher, lack of group speech sessions, and a revolving door for classroom teachers" (id.). Further, the parents asserted that they enrolled the student in Kumon to provide him with a plan of regular education study and daily exercises (id. at p. 2).

The parents requested that the February 9, 2018 stipulated agreement, which included attendance at AMAC with an extended school year, 20 hours per week of SETSS, reimbursement of $6,600 for 40 hours of speech-language therapy, and reimbursement of $3,600 for Kumon services, continue for the 2018-19 school year (IHO Ex. I at pp. 1, 3). Finally, the parents stated that in order to "compensate for the lack of a certified teacher in the classroom, abnormal teacher turnover, and a dearth of appropriate peer modeling of speech in the classroom," they were requesting an additional 52 hours per year of speech-language therapy for the student (id. at p. 3).

### B. Facts and Procedural History Subsequent to the Initial Due Process Complaint Notice

The parties proceeded to impartial hearing on July 20, 2018 (see Tr. pp. 1-8). At the hearing, the IHO noted that the district did not appear, despite attempts to reach it (Tr. p. 3). The parent indicated that they were seeking pendency pursuant to the February 9, 2018 stipulation (Tr. pp. 3-4). The IHO noted that he would likely grant the parent's request for pendency but would allow the district an opportunity to brief the issue (Tr. pp. 5-6).[11]

---

[11] During the July 20, 2018 hearing, two parent exhibits were admitted into the hearing record labeled as Parent Exhibits A and B. Parent Exhibit A was identified as the February 9, 2018 stipulation and Parent Exhibit B was identified as a description of the Kumon program (see Tr. p. 5). The February 9, 2018 stipulation was later entered into the hearing record as Parent Exhibit D. The document that was initially identified as Parent Exhibit B was not re-submitted by the parent and is not available for review. As the Kumon program is not at issue on appeal, the absence of this exhibit does not affect the outcome of this appeal.

On July 26, 2018, the parents filed a request for pendency with the Eastern District of New York (see generally Parent Ex. P). In an order dated August 27, 2018, the District Court granted the parents' request for a pendency order, obligating the district to maintain the student's educational placement as outlined in the February 2018 stipulation (see Parent Ex. Q).

The student was evaluated in April 2019 (Parent Ex. EE at p. 1). The resultant report, dated May 21, 2019, indicated that the student was attending an 8:1+2 special class at AMAC where he received speech-language therapy four times per week and OT twice per week (id.). The student's parents reported that he received tutoring outside of school for reading and math using Kumon, and received 20 hours of ABA services per week at home "through his IEP" (id.). The evaluator opined that, despite having shown progress in all areas, the student continued to have very significant developmental challenges and clear difficulties with maintaining attention and focus that would impact his ability to learn and function in class (id. at p. 3). The evaluator recommended placement in a small structured special education school for children with an autism spectrum disorder and with staff trained and experienced in working with children on the autism spectrum (id.). She further recommended the class should have a low student to teacher ratio and suggested that the student may need individual attention throughout much of the school day (id.). The evaluator recommended that the student continue to receive related services, as indicated on his IEP, including three to four speech-language therapy sessions per week, OT twice per week, and 20 hours of ABA therapy outside of school (id.).

By letter dated April 17, 2019, the executive director of AMAC informed the parents that AMAC would be closing effective July 15, 2019, due to financial issues (Parent Ex. O). The letter indicated that the district had been informed of the impending closure and would be scheduling CSE meetings to determine new placements (id.).

On May 13, 2019, the parents secured a private neuropsychological evaluation of the student to "disentangle whether his problems [were] associated with ASD or another neurodevelopmental disorder" and to "seek guidance regarding future school placements" for the student (Parent Ex. HH at p. 1). The resultant report indicated that test findings and observations confirmed the student's previous diagnosis of autism spectrum disorder as he exhibited a high level of autism spectrum disorder symptoms and his language remained extremely delayed (id. at p. 5). The report stated that the student also exhibited extreme levels of hyperactivity, impulsivity, and inattentiveness consistent with an attention deficit disorder (id.). The evaluator recommended placement in an ABA-based school for children with an autism spectrum disorder in a class with a small student to teacher ratio with children with minimal behavioral problems (id. at p. 6). In addition, the evaluator recommended that the student be provided with a 1:1 paraprofessional to help him refocus, social skills training incorporated into the school programming, daily speech therapy, and physical therapy (PT) and OT several days per week (id.). The evaluator also recommended that the student needed to continue to receive 20 hours per week of ABA therapy at home (id.).

The CSE convened on June 7, 2019 to develop the student's program for the 2019-20 school year (Parent Ex. U at p. 27).[12, 13] The resultant IEP reflected that the student was eligible for special education programs and services as a student with autism (id. at p. 1). The CSE made two 12-month placement recommendations: a 6:1+2 special class in a "NYSED-Approved Non Public School–Day"; and a 6:1+1 special class in a "NYSED-Approved NPS–Day Interim D75" (id. at p. 24).[14] Further, the CSE recommended related services including three 30-minute sessions per week of individual OT, three 30-minute sessions per week of individual speech-language therapy, two 30-minute sessions per week of group speech-language therapy, and one 60-minute session per month of group parent counseling and training (id. at p. 24). The IEP reflected that the student needed "special transportation accommodations/services as follows:" but did not provide details describing them (id. at p. 27).

The district issued a prior written notice dated June 11, 2019, that reflected a 10-month placement in a 6:1+1 special class in a "NYSED-Approved Non Public School–Day" and also reflected a special class with a staffing ratio of "NPS Ratio" plus related services of individual OT, individual and group speech-language therapy, and parent counseling and training (Parent Ex. U at p. 30). For the 12-month school year, the prior written notice indicated that the student's placement was "NYSED-Approved Non Public School–Day" 6:1+1 special class with an "NPS Ratio" as well as individual OT, individual and group speech-language therapy, and parent counseling and training (id.).[15] The district also issued a school location letter to the parent on June 11, 2019 (id. at p. 35).[16]

By letter dated August 3, 2019 the parent accepted placement at AHRC (Parent Ex. V).[17]

---

[12] The June 2019 IEP reflects that the CSE meeting was a reconvene of an IEP meeting; however, it does not identify when that meeting took place and the hearing record does not include a prior IEP (Parent Ex. U at p. 27).

[13] On May 27, 2019, the parent contacted the district's school psychologist via email and inquired as to whether the school psychologist had authority to write IEPs that provided weekly 1:1 home based instruction where the evidence showed the student needed 1:1 home based instruction as a related service (Parent Ex. T). The school psychologist responded that as she had explained earlier, home instruction was part of the "Home Schooling office" and she did not have that authority (id.).

[14] Both placements, according to the IEP, were set to begin on July 1, 2019 (Parent Ex. U at p. 24). Both were recommended for 35 times per week (id.).

[15] It is noted that the IEP recommended both a 6:1+2 special class and a 6:1+1 special class placement with the 6:1+1 special class identified as an interim placement (Parent Ex. U at p. 24).

[16] Testimony by the parent indicated that the school identified in the school location letter was a district 75 school, not an approved nonpublic school (Tr. pp. 302-03; see Parent Ex. U at p. 35).

[17] Testimony by the parent indicated that despite accepting the placement at AHRC, he was actually reluctant to place the student at AHRC but he accepted the placement because the student had been home for three months and when it was proposed by the district he thought "some school[ was] better than no school" (Tr. pp. 304-05; see Parent Ex. Y).

A pre-hearing conference was held on September 26, 2019 (see Tr. pp. 9-27). During that pre-hearing conference, the parties indicated that they had been in settlement negotiations and the district was seeking clarification as to the issues being raised (Tr. pp. 11-12).

In a letter dated October 10, 2019, the student's doctor described the student's sensory integration dysfunction and ADHD noting the student's high energy level and difficulty sitting still and further noting the parents' concern that the student would not be able to tolerate the long bus commute to and from school (Parent Ex. Y). The doctor indicated that the student was exhausted upon arriving home, that the frustrating and long bus ride could cause the student's behavior to regress, and that the long ride left insufficient time for the student to receive his mandated 21 hours per week of home-based instruction (id.). As such, the doctor along with the parents, requested that the student be granted a bus placement with no more than four children total and that the student be assigned a 1:1 paraprofessional on the bus (id.).

The CSE reconvened on October 8, 2019 (Parent Ex. W at p. 25). The new IEP reflected that the CSE changed its placement recommendation for the student to an 8:1+2 special class in an approved nonpublic day school (id. at p. 21). The student's OT services were reduced from three 30-minute individual sessions per week to one 30-minute individual and one 30-minute group session per week (compare Parent Ex. U at p. 24 with Parent Ex. W at p. 21). In addition, the student's speech-language therapy services were reduced from three 30-minute individual and two 30-minute group sessions per week to one 30-minute individual and one 30-minute group session per week (compare Parent Ex. U at p. 24 with Parent Ex. W at p. 21).[18] The October 8, 2019 IEP added special transportation services for the student beginning October 29, 2019, including a paraprofessional for adult supervision and a route with fewer students, a bus paraprofessional for safety, door to door bussing, and 2 large seats (Parent Ex. W at p. 24).[19]

## C. Subsequent Due Process Complaint Notices

The next hearing was held on October 23, 2019, and after a lengthy discussion, the parent indicated that he intended to file a new due process complaint notice (see generally Tr. pp. 64-77, 97-113; see also IHO Exs. II; III).

The second due process complaint notice was dated December 19, 2019 (IHO Ex. II at p. 1). In that complaint, the parents asserted that they were challenging the period from "February 9, 2019 to June 30, 2019" (id.).[20] Initially, the parents noted that AMAC had filed for bankruptcy

---

[18] The implementation date for these changes was September 26, 2019 (Parent Ex. W at pp. 20, 21).

[19] The hearing record contains another IEP dated October 8, 2019 (Parent Ex. Z). A review of the October 2019 IEPs reveals the only differences relate to the student's special transportation services (compare Parent Ex. W at p. 24 with Parent Ex. Z at p. 37). In addition to the special transportation accommodations/services included in the first October 8, 2019 IEP, the second October 8, 2019 IEP provided for air conditioning on the bus and limited travel time of not more than 90 minutes (Parent Exs. W at p. 24; Z at p. 37).

[20] Since the parent has challenged FAPE for the 2017-18, 2018-19, and 2019-20 school years and for reasons discussed further below, the parent's repeated inability to provide the correct dates in his pleading is not dispositive in this case; however, the parent is advised to take greater care in the future. Such carelessness could have been an issue or could be an issue in a case with different circumstances.

(id. at p. 2). Next, the parents contended that the district breached the February 9, 2018 stipulation as uncertified teaching assistants, who lacked the training and expertise to control the student's behavior, managed the classroom at AMAC (id.at p. 3). The parents further asserted that AMAC moved the student from classroom to classroom and changed his teachers without communicating with the parents (id.). The parents contend that this, along with the district's failure to develop an IEP between July 1, 2017 and June 30, 2018, denied the parent's participation in educational decisions (id. at pp. 2, 5-6). The parents also argued that the district had a duty to investigate and monitor the school it placed the student in and the district failed to perform this duty by not monitoring whether the school employed certified teachers in the classroom (id. at p. 3). According to the parents, due to the "excessive teacher turnover and a lack of certified and experienced teachers" the student's "behavior regressed tremendously" and his "academic and behavioral progress suffered" (id. at p. 4). Moreover, the parents contended that the district failed to conduct an FBA or a BIP (id. at pp. 2, 4-5).

The parents asserted that unless the student learned "urgently" to speak, the inability to speak would prevent the student from living a normal life (id. at p. 6). They argued that the student had been placed in a "non-speaking classroom from June 2015 to August 2018," that he lacked speaking classmates to provide models of speech he could imitate, and that he had failed to make progress in speech (id.).

The parents' proposed solution for the district's denial of FAPE was a transfer to Gersh, 100 hours of home-based 1:1 speech-language therapy, and 100 hours of home-based 1:1 ABA therapy, as well as any other relief deemed equitable and just (IHO Ex. II at p. 7).

In a third due process complaint notice, dated January 7, 2020, the parents challenged the district's decision to place the student at AHRC from September 12, 2019 to June 30, 2020 (IHO Ex. III at pp. 1, 5-6).[21] The parents asserted that the district failed to conduct an FBA and BIP for the student and excluded the parents from participating in the decision-making process (id. at pp. 4-5). Further, the parents asserted that the district had been unable to provide a (transportation) paraprofessional who "arrived daily" and without the paraprofessional, the bus matron did not allow the student on the bus; as a result the student was often unable to attend school (id. at pp. 2-3). The parents claimed that the irregular schedule disturbed and upset the student (id.). The parents also contended that AHRC was "excessively distant from home" and the bus often arrived at school after instruction had already started, which caused the student to miss valuable hours of instruction (id. at p. 3). Due to the issues with transportation, the parents estimated the student missed eight full days of school and an additional 40-50 hours of instruction due to late arrival (id. at p. 3). Additionally, the parents asserted that the student required less transportation time and more movement than his IEP provided (id. at p. 4). They reported that the student had been diagnosed with "hyperactive disorder" and required daily movement to release his "abundant energy" and that AHRC did not provide the opportunity for him to do so (id.).

In addition to missing school time, additional reasons the parents believed the placement at AHRC was not appropriate included that the district had not conducted an FBA or developed a

---

[21] The third due process complaint notice was incorrectly dated January 7, 2019;, the IHO noted that it was supposed to be dated January 7, 2020 (see IHO Decision at pp. 2, 4; see also IHO Ex. III at p. 8).

BIP for the student, that the school did not have a classroom with children who could speak, that the school did not provide sufficient speech-language therapy, that the student's class did not allow for necessary 1:1 instruction, that the student was not provided opportunities for movement, that the school did not provide vocational training, and that the school did not send the parents daily reports of the student's behaviors (IHO Ex. III at pp. 5-6).

Related to the parents' assertion that the district failed to offer sufficient speech-language therapy, the parents argued that the district's recommendations were not based on evaluative information but rather availability of speech-language services at ARHC (IHO Ex. III at p. 4). The parents contended that the student required daily speech-language therapy; however, the recommendation for daily speech services was not made because the district could not find a school that could provide the services and the district representative lacked the authority to make such a recommendation (id.). Moreover, the parents again argued that the student should have been placed with students who were verbal who he could model (id. at p. 5). The parents also contended that the IEP did not provide for the student's need for 1:1 instruction as the student was extremely distractible and could not learn in a class setting (id.). They asserted that in a classroom of eight students at AHRC, the student stopped learning (id.). The parents also argued that the student needed to learn a vocation; specifically that he showed an aptitude for music and he required a school that offered more music classes (id.).

Based on the above, the parents requested prospective payment of the student's tuition at Gersh supplemented by one hour daily of 1:1 supervision by a teacher or experienced teaching aide to allow the student to complete his Kumon worksheets, 60 minutes of speech-language therapy per day, 30 minutes of exercise per day and 30 minutes of vocational instruction (supervised instrument practice) per day (IHO Ex. III at p. 7). Further, the parents requested compensatory education of 150 hours of home-based 1:1 ABA instruction for the student's missed school and 100 hours of speech-language therapy (id. at p. 8).[22]

### D. Impartial Hearing Officer Decision

The parties proceeded to and completed an impartial hearing on the merits of the parents' claims on March 11, 2020 (see Tr. pp. 116-316). In a decision dated April 20, 2020, the IHO found that the district failed to meet its burden of proof and therefore found that the district failed to offer the student a FAPE for the 2017-18, 2018-19, and 2019-20 school years (IHO Decision at pp. 7-8, 16). The IHO determined that the district "failed to present any evidence [that it] provided

---

[22] By letter dated March 3, 2020, the parents were notified that the student had been provisionally accepted into Gersh Academy for the 2019-20 school year (Parent Ex. AA). The letter indicated the student would be placed in one of the school's "Behavioral, Academic and Social Enrichment (B.A.S.E.) classrooms" with related services of five 30-minute individual speech-language sessions, two 30-minute individual OT sessions, two 30-minute individual PT sessions, a 1:1 paraprofessional, and parent counseling/training (id.). The letter indicated that the student's enrollment in Gersh was contingent upon receipt of funding via either private parental payment, parental payment with tuition/services reimbursement from the student's home district, or direct/prospective payment by the student's home district (id.).

10

a program and that such provided a FAPE" and "utterly failed to meet their burden of proof" (id. at p. 7).[23]

The IHO held that due to the district's denial of FAPE for the 2019-20 school year, prospective tuition payment for placement of the student at Gersh was warranted (IHO Decision at p. 8). The IHO determined that an appropriate program for the student "[wa]s one in which the student's behavior management needs c[ould] be met and such program would be a non-public school placement that must utilize ABA methodology throughout the school day under the supervision of an on-site Board-Certified Behavior Analyst" (id.). Further, an appropriate program would be a 12-month program and would include 1:1 speech-language therapy daily for 30-minute sessions (id.). The IHO found that placement at Gersh was supported by the evidence in the hearing record, "particularly in the absence of any program offered by the District" that was within "a reasonable commute of no longer than one hour of special education transportation each way" (id.).

Turning next to the appropriateness of Gersh, the IHO found that "the education and services provided at the placement me[]t the unique needs of the Student" (IHO Decision at p. 10). The IHO held that the program would provide 1:1 attention for the student and that witness testimony demonstrated that the program would be appropriate to meet the student's specific needs (id.). Notably, the IHO stated that the parents' witnesses were "detailed and specific," and he found them to be "very credible and worthy of belief" (id.). Further, the IHO stated that the witness from Gersh "provided clear, concise, and specific detailed answers to how this student learned and what type of program [he] required" (id.). The IHO gave "serious weight" to the testimony and "based on the credible evidence presented hereby [found] that the program at the private placement would be designed to meet the unique educational needs of the student" (id. at p. 11).

The IHO then held that equitable considerations in this matter favored the parents' request for prospective payment of the student's tuition at Gersh for the 2020-21 school year (IHO Decision at p. 12). The IHO determined that the parents fully cooperated with the district and noted that the district did not allege that the parents failed to cooperate (id.). Moreover, the IHO found that it was unreasonable to require a student to remain on a school bus two hours each way and held that this student required limited travel time not to exceed one hour each way (id.).

Turning to relief, the IHO noted that the parents presented uncontradicted testimony as to "the specifics of compensatory education services required to remedy the student's many skill deficits" (IHO Decision at p. 13). Additionally, the IHO found that the district's actions constituted a gross violation of the IDEA and based on the district's violations, the parents' requested relief for 1:1 remediation services was appropriate; however, the IHO noted that the parents' request was inconsistent as the parents requested different relief in their closing brief from what was requested during the hearing (id. at pp. 13-14). The IHO noted that he would hold the parents to the relief requested at the hearing, which was 300 hours of 1:1 speech-language therapy services, 300 hours

---

[23] Additionally, the IHO held that district failed to evaluate the student as it "utterly failed to provide a detailed, appropriate, and current functional behavioral assessment for the student" and "failed to provide any positive behavioral supports or develop an appropriate Functional Behavioral Assessment (FBA) done by a" BCBA (IHO Decision at p. 9).

of 1:1 ABA services, prospective placement at Gersh, and reimbursement for Kumon tutoring (id. at p. 14). The IHO granted 300 hours of 1:1 speech-language therapy services; 300 hours of 1:1 ABA services; and prospective tuition and costs of placing the student at Gersh for the 2020-21 school year, beginning July 2020 (id. at pp. 14-15). The IHO denied the parents' requested relief of reimbursement of Kumon tutoring hours finding that "such service was not a special education service and their testimony concerning the reasonable cost of such services was deficient" (IHO Decision at p. 15).[24]

## IV. Appeal for State-Level Review

The parents appeal. The parents assert that the only aspect of the IHO decision they are appealing pertains to the IHO's failure to grant 20 hours per week of home-based 1:1 ABA services and 40 hours per year of home-based 1:1 speech-language therapy.

The parents contend that they requested a continuation of services from the February 2018 stipulation which included the home-based services of ABA and speech-language therapy. The parents argue that the record supports the need for these services and that the district failed to present any evidence or testimony to the contrary.

The parents contend that the IHO failed to grant the necessary hours of services recommended by their expert. As such, the IHO decision is "regressive" because the overwhelming evidence demonstrates the student requires 1:1 instruction, and without the requested 1:1 instruction the student will still be denied a FAPE. The parents request that the IHO decision be modified to grant 20 hours per week of home-based 1:1 ABA services and 40 hours per year of home-based 1:1 speech-language therapy.

The district, by answer with a cross-appeal, generally admits and denies the parents' allegations.[25] The district requests that an SRO either affirm "in whole" the IHO decision by denying the additional requested relief or grant its cross-appeal by overturning the IHO order granting prospective tuition at Gersh for the 2020-21 school year.[26]

Initially, the district asserts that the parents' request for review is procedurally defective because it does not comply with the practice regulations regarding clarity of issues presented, citations to the hearing record, and the numbering of pages.

---

[24] The IHO noted that if the district believed the award was in conflict with a stipulation entered into between the parties, the district could seek enforcement of that stipulation through the court system as the IHO did not have jurisdiction over the enforcement of stipulations (IHO Decision at p. 13).

[25] The district acknowledges that it did not create an IEP for either the 2017-18 or 2018-19 school years while the student attended AMAC (Answer with Cross Appeal at ¶1),

[26] The district requests that if the award of prospective placement at Gersh is denied, the case be "remanded to develop a record for appropriate relief."

12

In regard to the parents' request for additional compensatory education, the district asserts that the IHO awarded significant relief to compensate for the deprivation of FAPE. The district contends that the IHO granted relief based on the parents' specific request on the record and that the parents had "every opportunity at the hearing to request additional relief." The district further argues that the parent is now "simply changing his mind on his requested relief, and asking for more without factual or legal support for the change in the request." Moreover, the district asserts that the "IHO's findings of facts and decision [] was well reasoned, supported by the record, and was largely correct and appropriate" and accordingly, "the decision should not be disturbed." Finally, the district asserts that the parents are attempting to seek a maximization of services for the student and the district is not legally obligated to provide the additional requested relief.[27]

In the alternative, the district requests that the IHO's order of prospective tuition at Gersh for the 2020-21 school year be rescinded as the IHO exceeded his authority by granting such an award. First, the district contends that the documentation regarding the student's placement at Gersh is inadequate as there is no contract or affidavit establishing the cost of Gersh for the 2020-21 school year or an agreement between the parents and Gersh of the commitment to place the student there. Next, the district asserts the parents did not request prospective tuition at Gersh in any of the due process complaint notices filed. The district argues that the IHO expanded the scope of the hearing without express consent of the parties as the parents were only requesting tuition at Gersh for the 2019-20 school year.

The parents filed a reply to the district's cross appeal. The parents assert that the district failed to appeal several findings made by the IHO, and therefore, those findings are now final and binding. Specifically, the parents contend that the district failed to appeal the IHO's findings of a denial of FAPE finding for all three school years at issue, a gross violation, that it was not reasonable for the student to continue at AHRC, and that the student's travel time must not exceed one hour each way.

## V. Applicable Standards

Two purposes of the IDEA (20 U.S.C. §§ 1400-1482) are (1) to ensure that students with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living; and (2) to ensure that the rights of students with disabilities and parents of such students are protected (20 U.S.C. § 1400[d][1][A]-[B]; see generally Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 239 [2009]; Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206-07 [1982]).

A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the

---

[27] The district asserts that while it does not contend the award of prospective placement at Gersh for the 2020-21 school year was appropriate, "in the interest of finality and reducing litigation, and with the hope of clarifying and simplifying the record, procedural history, and pendency in this case, [the district] is willing to allow the affirmance of IHO's award, and that Petitioner's appeal be denied" (Answer with Cross Appeal at ¶ 24). However, if the award of tuition at Gersh is upheld, the district requests that the parents "be precluded from filing for a denial of FAPE or placement for the 2020/2021 school year" (id.).

IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Rowley, 458 U.S. at 206-07; T.M. v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 151, 160 [2d Cir. 2014]; R.E. v. New York City Dep't of Educ., 694 F.3d 167, 189-90 [2d Cir. 2012]; M.H. v. New York City Dep't of Educ., 685 F.3d 217, 245 [2d Cir. 2012]; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). "'[A]dequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP'" (Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 129 [2d Cir. 1998], quoting Rowley, 458 U.S. at 206; see T.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 253 [2d Cir. 2009]). The Supreme Court has indicated that "[t]he IEP must aim to enable the child to make progress. After all, the essential function of an IEP is to set out a plan for pursuing academic and functional advancement" (Endrew F. v. Douglas Cty. Sch. Dist. RE-1, 580 U.S. __, 137 S. Ct. 988, 999 [2017]). While the Second Circuit has emphasized that school districts must comply with the checklist of procedures for developing a student's IEP and indicated that "[m]ultiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not" (R.E., 694 F.3d at 190-91), the Court has also explained that not all procedural errors render an IEP legally inadequate under the IDEA (M.H., 685 F.3d at 245; A.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist., 553 F.3d 165, 172 [2d Cir. 2009]; Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]). Under the IDEA, if procedural violations are alleged, an administrative officer may find that a student did not receive a FAPE only if the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (c) caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 CFR 300.513[a][2]; 8 NYCRR 200.5[j][4][ii]; Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 525-26 [2007]; R.E., 694 F.3d at 190; M.H., 685 F.3d at 245).

The IDEA directs that, in general, an IHO's decision must be made on substantive grounds based on a determination of whether the student received a FAPE (20 U.S.C. § 1415[f][3][E][i]). A school district offers a FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction" (Rowley, 458 U.S. at 203). However, the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP" (Walczak, 142 F.3d at 130; see Rowley, 458 U.S. at 189). "The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created" (Endrew F., 137 S. Ct. at 1001). The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents" (Walczak, 142 F.3d at 132, quoting Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 [2d Cir. 1989] [citations omitted]; see Grim, 346 F.3d at 379). Additionally, school districts are not required to "maximize" the potential of students with disabilities (Rowley, 458 U.S. at 189, 199; Grim, 346 F.3d at 379; Walczak, 142 F.3d at 132). Nonetheless, a school district must provide "an IEP that is 'likely to produce progress, not regression,' and . . . affords the student with an opportunity greater than mere 'trivial advancement'" (Cerra, 427 F.3d at 195, quoting Walczak, 142 F.3d at 130 [citations omitted]; see T.P., 554 F.3d at 254; P. v. Newington Bd. of Educ., 546 F.3d 111, 118-19 [2d Cir. 2008]). The IEP must be "reasonably calculated to provide some 'meaningful' benefit" (Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 [2d Cir. 1997]; see Endrew F., 137 S. Ct. at 1001 [holding that the IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances"]; Rowley, 458 U.S. at 192). The student's recommended program must also be provided in the least restrictive environment

14

(LRE) (20 U.S.C. § 1412[a][5][A]; 34 CFR 300.114[a][2][i], 300.116[a][2]; 8 NYCRR 200.1[cc], 200.6[a][1]; see Newington, 546 F.3d at 114; Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 108 [2d Cir. 2007]; Walczak, 142 F.3d at 132).

An appropriate educational program begins with an IEP that includes a statement of the student's present levels of academic achievement and functional performance (see 34 CFR 300.320[a][1]; 8 NYCRR 200.4[d][2][i]), establishes annual goals designed to meet the student's needs resulting from the student's disability and enable him or her to make progress in the general education curriculum (see 34 CFR 300.320[a][2][i], [2][i][A]; 8 NYCRR 200.4[d][2][iii]), and provides for the use of appropriate special education services (see 34 CFR 300.320[a][4]; 8 NYCRR 200.4[d][2][v]).[28]

A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parents, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim (Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]; Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369-70 [1985]; R.E., 694 F.3d at 184-85; T.P., 554 F.3d at 252). In Burlington, the Court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (471 U.S. at 370-71; see Gagliardo, 489 F.3d at 111; Cerra, 427 F.3d at 192). "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance" had it offered the student a FAPE (Burlington, 471 U.S. at 370-71; see 20 U.S.C. § 1412[a][10][C][ii]; 34 CFR 300.148).

The burden of proof is on the school district during an impartial hearing, except that a parent seeking tuition reimbursement for a unilateral placement has the burden of proof regarding the appropriateness of such placement (Educ. Law § 4404[1][c]; see R.E., 694 F.3d at 184-85).

## VI. Discussion

### A. Preliminary Matters

#### 1. Compliance with Practice Regulations

The district contends that the parents' request for review is procedurally defective as it failed to set forth a clear and concise statement of the issues presented for review pursuant to Part 279 of the State regulations. Specifically, the district asserts that the parents' "specific assertions are difficult to discern at best," that the parents' failure to comply with the regulations "thwarted" their "ability to formulate an answer to any possible outstanding issues raised on appeal," and that

---

[28] The Supreme Court has stated that even if it is unreasonable to expect a student to attend a regular education setting and achieve on grade level, the educational program set forth in the student's IEP "must be appropriately ambitious in light of his [or her] circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom. The goals may differ, but every child should have the chance to meet challenging objectives" (Endrew F., 137 S. Ct. at 1000).

15

the parents failed to properly cite to the hearing record and did not include page numbers in the request for review (id.).[29]

State regulation requires that a request for review "identify the findings, conclusions, and orders to which exceptions are taken, or the failure or refusal to make a finding" (8 NYCRR 279.4[a]). Further, section 279.8 of the State regulations requires that a request for review shall set forth:

> (1) the specific relief sought in the underlying action or proceeding;
>
> (2) a clear and concise statement of the issues presented for review and the grounds for reversal or modification to be advanced, with each issue numbered and set forth separately, and identifying the precise rulings, failures to rule, or refusals to rule presented for review; and
>
> (3) citations to the record on appeal, and identification of the relevant page number(s) in the hearing decision, hearing transcript, exhibit number or letter and, if the exhibit consists of multiple pages, the exhibit page number

(8 NYCRR 279.8 [c][1]-[3]). The regulation further states that "any issue not identified in a party's request for review, answer, or answer with cross-appeal shall be deemed abandoned and will not be addressed by a State Review Officer" (8 NYCRR 279.8 [c][4]).

Generally, the failure to comply with the practice requirements of Part 279 of the State regulations may result in the rejection of the submitted documents or the dismissal of a request for review by an SRO (8 NYCRR 279.8[a]; 279.13; see M.C. v. Mamaroneck Union Free Sch. Dist., 2018 WL 4997516, at *23 [S.D.N.Y. Sept. 28, 2018] [upholding dismissal of allegations set forth in an appeal to an SRO for "failure to identify the precise rulings presented for review and [failure] to cite to the pertinent portions of the record on appeal, as required in order to raise an issue" for review on appeal]; T.W. v. Spencerport Cent. Sch. Dist., 891 F. Supp. 2d 438, 440-41 [W.D.N.Y. 2012] [upholding dismissal of a petition for review that was untimely and exceeded page limitations]). However, "judgments rendered solely on the basis of easily corrected procedural errors or 'mere technicalities,' are generally disfavored" (J.E. v. Chappaqua Cent. Sch. Dist., 2015 WL 4934535, at *4-*6 [S.D.N.Y. Aug. 17, 2015], quoting Foman v. Davis, 371 U.S. 178 [1962]).

As to the claims raised by the district related to citations and lack of page numbers, it is initially noted that the parents' request for review received by this office was paginated and therefore any claim that it was procedurally defective on those grounds is without merit. Additionally, the district asserts that the request for review is procedurally defective because the parent failed to properly cite to exhibit pages and the hearing record (Answer with Cross-Appeal ¶17). As noted above State regulations require that a request for review contain citations to the hearing record, including the specific page number of an exhibit that is multiple pages (see 8

---

[29] Further, the district contends that, even though the parents have appeared before the SRO as pro se, the student's father is an attorney and should not receive the leniency normally granted to pro se parents.

NYCRR 279.8[c][3]). In this instance, the parents cited to specific transcript pages; however, in citing exhibits, the parents cited to the exhibit but generally did not identify the specific page number within the cited exhibit, except for citations to "Exhibit PU, p. 25" and "Exhibit D-1, p. 2," for example (Req. for Rev. p. 3). The parents' failure to properly cite the page numbers of the exhibits consistently, while not fully in compliance with the State regulation, does not support a finding that the request for review should be dismissed.

Finally, the district asserts that the parents failed to provide a clear and concise statement of the issues on appeal. Although, as noted, the request for review is not perfect, the parents' grievances with the IHO decision are clear. The parents assert that they are appealing the relief granted by the IHO because they believe they should have been awarded more, specifically, 20 hours of 1:1 home based ABA services per week and 40 hours of 1:1 speech-language services per year (Req. for Rev. at pp. 1-2, 7-8, 10). While the district asserts that it was unable to formulate a response "to any possible outstanding issues raised on appeal," the district did respond to the parents' specific requests for additional relief (see Answer with Cross-Appeal ¶¶19-23). Accordingly, there is not a sufficient basis raised by the district to support a dismissal of the parents' request for review on procedural grounds.

### 2. Scope of Review

As discussed above, the parents confine their appeal to the relief awarded by the IHO. Moreover, the district has not appealed from the IHO's findings regarding FAPE and only appeals from the IHO's award of prospective placement of the student at Gersh for the 2020-21 school year.

The IHO found that the district failed to offer the student a FAPE for the 2017-18, 2018-19, and 2019-20 school years (IHO Decision at pp. 7-9, 12-13, 16). The IHO held that the district failed to properly evaluate the student in all areas of suspected disability as the district failed to conduct an FBA or provide the student with any positive behavioral supports or a BIP (id. at p. 9). The IHO further held that an appropriate placement for the student would be one "in which the student's behavior management needs can be met and such a program would be a non-public school placement that utilized ABA methodology throughout the school day under the supervision of an on-site Board-Certified Behavior Analyst" and based on this, the IHO held that Gersh was an appropriate program "in the absence of any program offered by the District that is a reasonable commute of no longer than one hour of special education transportation each way" (id. at p. 8). Further, the IHO held that an appropriate program for the student would include related services of 1:1 speech-language therapy daily for 30-minute sessions and an extended school year (id.). The IHO further held that Gersh was an appropriate program for the student (id. at pp. 10-11). Finally, the IHO also held that equitable considerations favored the parent (id. at p. 12).

As noted above, the only issues raised by the parties pertain to the relief sought by the parents and awarded by the IHO, therefore, all other findings made by the IHO have become final and binding upon the parties and will not be further addressed (34 CFR 300.514[a]; 8 NYCRR 200.5[j][5][v]; 279.8[c][4]; see M.Z. v. New York City Dep't of Educ., 2013 WL 1314992, at *6-*7, *10 [S.D.N.Y. Mar. 21, 2013]). Specifically, the only relief in question is whether the student is entitled to prospective tuition at Gersh for the 2020-21 school year, whether the student is

17

entitled to 20 hours of 1:1 home-based ABA services per week, and whether the student is entitled to 40 hours of 1:1 home-based speech-language therapy per year.

## B. Compensatory Education

The parents request 40 hours per year of 1:1 home-based speech-language therapy and 20 hours per week of 1:1 home-based ABA services. The parents contend that the IHO decision failed to offer a reason for omitting home-based services. The parents argue that the student required home-based speech due to his delayed speech and that the IHO only granted 25% of the amount of speech recommended by the parents' expert. In addition, the parents contend that the hearing record included evidence that the student's instruction ratio was 1:1 and that the IHO's failure to consider ABA services as requested by the parents was regressive.

In response, the district argues that the IHO awarded significant relief to the parents to compensate for the deprivation of FAPE and that the parents did not, at the hearing, request the additional compensatory education services they are now requesting and they are simply changing their mind regarding the requested relief. Further, the district argues that the parents' request for home-based services represents a maximization of services for the purpose of generalization, which it is not legally obligated to provide to students (id. at pp. 7-8).

First, to address the district's assertion that the parents failed to request these compensatory education services at the hearing, the parents requested in their first due process complaint notice that the services agreed to in the February 2018 stipulation of 20 hours per week of 1:1 SETSS and 40 hours per year of speech-language therapy continue pursuant to the agreement (IHO Ex. I at p. 3). In the second due process complaint notice, the parents requested a transfer to Gersh, 100 hours of both home-based speech-language therapy and home-based ABA services (IHO Ex. II at pp. 2, 7). In the third due process complaint notice, the parents requested a "continuation of [the student's] extended day program, transfer to Gersh Academy with supplementary services, and compensatory education" (IHO Ex. III at p. 2).[30] During the hearing, the parents were specifically asked by the IHO what relief they were seeking and in response, the student's father indicated that he was seeking 100 hours of 1:1 speech-language therapy and 100 hours of 1:1 ABA therapy for each year a FAPE was denied and that he was also requesting a transfer of the student to Gersh (Tr. pp. 173-75). Toward the end of the hearing, the parent indicated that he was also seeking a continuation of the services the student was receiving as part of pendency going forward (Tr. p. 309). Finally, the parents, in the closing brief, requested an immediate placement at Gersh, 20 hours per week of home-based 1:1 ABA services, 1:1 speech-language therapy ten times per week for 30-minute sessions at school, and compensatory education of ABA services and speech-language therapy (IHO Ex. IV at pp. 4-8).[31] The hearing record demonstrates that the parents clearly requested 20 hours per week of home-based ABA services both during the hearing and in

---

[30] For compensatory education, the parents requested 150 hours of home-based ABA services and 100 hours of speech-language therapy for the remainder of the school year (IHO Ex. III at p. 8).

[31] The parent requested 460 hours of ABA services and 536 hours of speech-language therapy as compensatory education (IHO Ex. IV at p. 7).

18

their pleadings. However, the parents did not clearly assert their claim for 40 hours per year of home-based speech-language therapy during the hearing; though the parents did indicate in the initial due process complaint notice that they were seeking such services to continue. Therefore, the parents did raise home-based services during the hearing at various times as part of their request for relief and the district's assertion to the contrary is without merit.[32]

### 1. At-Home Speech Language Services

Turning first to the parents' request for at home speech-language services, the May 21, 2019 assessment of the student, conducted by the developmental pediatrician who had followed him for years, did not include a recommendation for the student to receive speech-language services outside of school (see Parent Ex. EE at pp. 1, 3). While her report did recommend that the student continue to receive 20 hours of ABA therapy outside of school, with regard to related services, the report reflected only that the student should continue to receive related services as indicated in his IEP including "speech-language therapy 3-4 times weekly, and OT twice weekly" (id. at p. 3). The evaluation report reflected information from the student's then-current teacher that indicated while the student was able to read, write, do basic math and play the piano, his speech was "inhibited" (id. at p. 1). His teacher further indicated that the student usually spoke in 2-4 word phrases and occasionally used complete sentences when prompted (id.).

Similarly, recommendations in the May 2019 neuropsychologist's evaluation report did not include a recommendation for the student to receive speech-language therapy services outside of school (see Parent Ex. HH at pp. 6-7). Here again, while the evaluators specifically recommended continuation of the student's 20 hours per week of home-based ABA therapy, with regard to speech-language therapy, the recommendation stated only that the student required speech-language services on a daily basis, and did not specify whether they needed to be provided at home or outside of school (id.). With regard to speech-language functioning, the neuropsychological evaluation report reflected that the student was able to read but did not know the meaning of many words and typically spoke in phrases (id. at p. 2).

Notwithstanding this, testimony by the clinical psychologist who contributed to the neuropsychological evaluation, indicated that the student's expressive and receptive language abilities were extremely low, "literally in the extremely low range" and that the student should receive speech-language therapy "at least one...to two hours a day" (Tr. pp. 261-62, 269).[33] The evaluator further testified that it was extremely important for the student to develop speech in order to develop relationships and potentially hold some form of work in the future and function independently (Tr. p. 272). As such, the psychologist stated that he would prescribe two hours of compensatory speech-language therapy for each school day beginning in February 2018 going forward, or basically two years (Tr. pp. 272-73). He also indicated that it would be great if the student received the two hours of speech-language therapy integrated into the school day (Tr. p.

---

[32] It is noted that the parents' requested relief was jumbled throughout the pleadings and hearing record. The parent is reminded that although this might not be his usual area of practice, he should have been able to clearly state the relief he seeks in a more coherent manner.

[33] The clinical psychologist contributed to the May 2019 evaluation (Tr. pp. 262-63; see Parent Ex. HH).

276). The evaluator did not indicate that any of the services discussed were to be provided either outside of school or in the home (see Tr. pp. 269, 272-73).

I note that the hearing record does not include any testimony by a speech-language provider of the student. However, testimony by the SETSS provider who provided the student's home-based ABA services indicated that she recommended compensatory speech-language therapy for the student for the time period that the student entered AHRC in September 2019 to March 2020, approximately 6 months, at a rate of two hours per week times 24 weeks, or 48 hours (Tr. pp. 199-201). While the SETSS provider also testified that she agreed with the recommendations made in the doctor's and psychologists' reports regarding the continuation of 20 hours per week of compensatory home-based ABA services, she did not indicate that her recommendation for compensatory speech-language services was for that service to also be provided in the home or outside of school (Tr. p. 209; Parent Exs. EE at p. 3; HH at p. 7).

The special education teacher, who provided home-based ABA instruction to the student, described his disability as "communication-impaired" and explained that she worked primarily on promoting communication in order for the student to be able to integrate into the community and function in society (Tr. p. 284). While she further testified that after school speech-language therapy would help the student to progress in speech, she did not indicate that the student required it (id.).

Based on the evidence in the hearing record, including that documentary evidence produced by the parents and the testimony of the student's providers, the parents' request for 40 hours per year of home-based speech-language services is denied. Although, the student has speech-language deficits, the hearing record does not demonstrate that home-based services are necessary in order for the student to receive a FAPE.

## 2. At-Home ABA Services

Turning next to the requested home-based ABA services, as noted above, a private neuropsychological evaluation of the student was conducted in May 2019 (see Parent Ex. HH). Test findings and observations confirmed the student's previous diagnosis of an autism spectrum disorder and the evaluator described the extent of the student's needs noting that the student exhibited a high level of "autism spectrum disorder symptoms," extremely delayed language development, extreme hyperactivity, impulsivity, and inattention (consistent with an attention deficit disorder), as well as deficits in socialization including the inability to initiate play with others, understand social cues, or establish friendships (id. at p. 5). The report further reflected the student's sensory deficits including extreme sensitivity to loud noises and bright lights, and that the student engaged in chewing his clothing, smelling objects, often put objects into his mouth, and had difficulty adjusting to changing environments (id.).

Based on the above, in addition to the recommendation that the student be placed in a school for children with autism spectrum disorders where ABA was incorporated into all aspects of the curriculum, the neuropsychological evaluation recommended that the student continue to receive 20 hours per week of ABA therapy at home (Parent Ex. HH at pp. 6-7).

In explaining his report and recommendations, the clinical psychologist testified that he found that the student had an autism spectrum disorder, level 3, which he indicated was the level requiring the most support (Tr. p. 265). He testified that "[i]ndividuals with level three usually have the weakest language skills and the most difficulty functioning independently and require the most intensive intervention in order to make improvements in their…daily functioning" (id.). He further testified that an FBA would absolutely be helpful for the student as it was the first step in getting ABA therapy, which he stated was "something that's most helpful with the children with the more severe forms of autism spectrum disorder" (Tr. pp. 266-67). The evaluator testified that the student's behavior was interfering with his learning and that there was a need to make modifications so that the student could sit in the classroom and learn and also be able to better interact with his peers and teachers (Tr. p. 267). He stated that the student was not able to work independently without supervision because he was very easily distracted, got off task easily, and required a lot of redirection, and even given that support, it was still a challenge (Tr. p. 269). The neuropsychologist testified that the student needed 1:1 instruction in class and also outside of class and therefore they recommended 20 hours per week of 1:1 ABA instruction in the home in addition to an ABA infused curriculum at school (Tr. pp. 268, 270, 274). He opined that the person providing the student's 1:1 ABA instruction at home should be a BCBA or an experienced teacher who was supervised by a BCBA (Tr. pp. 275-78).

The April 3, 2019 assessment of the student by his physician also described the student as continuing to demonstrate very significant developmental challenges including a severe autism spectrum disorder, a cognitive level that was significantly below average, and clear difficulties with maintaining attention and focus that impacted his ability to learn and function in class (Parent Ex. EE at p. 3). In her report, the doctor recommended that for the 2019-20 school year the student be placed in a small, structured, special education school for students with autism spectrum disorder where teachers, therapists, and other staff in the school were trained and experienced in working with children on the autism spectrum (id.). The doctor indicated that the student to teacher ratio should be low and that the student may need individual attention throughout much of the school day (id.). The student's doctor did not specifically recommend that the student receive ABA therapy in school; however, she recommended that the student should continue to receive related services as indicated in his IEP, including three to four sessions per week of speech-language therapy and two sessions per week of OT and, in addition, she recommended that the student should continue to receive 20 hours per week of ABA therapy outside of school (id.).[34]

Testimony by the assistant principal at Gersh indicated that she found the recommendations in the two evaluations for 20 hours per week of 1:1 home based ABA to be appropriate (Tr. p. 224). She further testified that in her experience, as an educator, this instruction could help the student to complete his homework and support him academically as well as help him to progress socially at school and address his behavior issues in a positive way (Tr. pp. 224-25).

Testimony by the student's special education teacher indicated that she also agreed with the two evaluation reports that the student needed 20 hours per week of 1:1 ABA instruction after school (Tr. pp. 284-85). She testified further that the student needed 1:1 ABA instruction after school because it allowed him to carry over what he did in school and reinforced his skills (id.).

---

[34] The student's doctor did not testify at the hearing.

The home ABA provider testified that if the student did not receive the 1:1 instruction after school, he would not be able to function in everyday society (Tr. p. 285). Her testimony indicated that the home ABA providers reinforced the skills that the student needed academically, physically, socially, and emotionally (id.).

The SETSS teacher testified that she also agreed with the recommendations made in the two evaluation reports to continue the 20 hours of 1:1 home-based ABA services because the student needed consistency (Tr. p. 190). She testified that the purpose of the 1:1 home-based ABA was to "enhance the skills that [the student] learns in school as well as to teach him life skills that he needs to function at home and in society" (Tr. pp. 190-91). The SETSS teacher testified that her services were "extremely appropriate" because she was trying to maintain and decrease the maladaptive behaviors caused by the lack of consistency in other settings, the extended time on the bus, the lack of school over the summer, and teacher turnover (Tr. p. 205). She testified that in her opinion the only consistency the student had had was his home-based services (id.).

Based on the above, it is apparent that some part of the home-based ABA services were directed at generalizing skills the student learns across environments, but that overall, the witnesses presented by the parents believed the home-based services were necessary for the student to benefit from his educational program. The district correctly asserts that the district is not required to fund, as compensatory education, services that are directed at generalization of skills outside of school as such services are in excess of a FAPE (L.K. v. New York City Dep't of Educ., 674 Fed. App'x 100 [2017]). However, the hearing record does not draw a line at which point a determination could be made that the student would receive educational benefit from his placement at Gersh with a more limited number of home-based ABA services than the 20 hours per week requested by the parents. Additionally, the district does not present a counterargument as to how many hours of home-based ABA services may be necessary for the student to benefit from his school-based program.

Under these circumstances, the parents request for 20 hours per week of home-based ABA services is granted.

### 3. Placement at Gersh

Turning next to the IHO's award of prospective placement of the student at Gersh for the 2020-21 school year, the IHO held that the placement at Gersh was an appropriate program for the student and ordered the district to "pay directly to Gersh Academy the full and complete tuition and costs for the student to attend their program for the 2020-2021 school year that begins July 2020" (IHO Decision at pp. 10-11, 16). Initially, the district does not contend that Gersh is not an appropriate placement for the student. The district asserts in its answer with cross-appeal that "the awarded substantive program at Gersh is appropriate and supported by the record." Rather than asserting that Gersh is inappropriate to meet the student's needs, the district objects to the award being for the 2020-21 school year instead of the 2019-20 school year, which the parents had initially requested.[35] The district also cross-appeals from the award of placement at Gersh alleging

---

[35] The parents repeatedly stated during the hearing that they were seeking placement of the student at Gersh (Tr. pp. 134, 173). When asked about the district's opinion on the request for placement at Gersh, the district's attorney

that there was inadequate documentation of the cost of tuition at Gersh for the 2020-21 school year or evidence that there is a seat available for the student at the school. Finally, the district contends that an award of placement at Gersh for the 2020-21 school year will circumvent the statutory process whereby a student's IEP is reviewed annually.

Awarding prospective placement of a student in a nonpublic school, under certain circumstances, has the effect of circumventing the statutory process, pursuant to which the CSE is tasked with reviewing information about the student's progress under current educational programming and periodically assessing the student's needs (see Adams v. Dist. of Columbia, 285 F. Supp. 3d 381, 393, 396-97 [D.D.C. 2018] [noting with approval the hearing officer's finding "that the directives of IDEA would be best effectuated by ordering an IEP review and revision, rather than prospective placement in a private school"]; see also Student X v. New York City Dep't of Educ., 2008 WL 4890440, at *16 [E.D.N.Y Oct. 30, 2008] [noting that "services found to be appropriate for a student during one school year are not necessarily appropriate for the student during a subsequent school year"]).

Of particular concern is that it is far less problematic for an administrative hearing officer to direct a school district to provide a student with discrete forms of compensatory education in a placement that is implemented by the public school district, such as additional instructional time in a specific subject area or additional related services to support a particular need or remediate a past deficiency. It is expected that such remedial services will be provided in a setting in which the CSE will also continue to have the responsibility to develop and implement a comprehensive IEP that takes into account all aspects of the student's needs and educational environment when delivering the remedial, compensatory remedy, and such relief is typically flexible and can be provided in a wide variety of educational placements. However, relief in the form of a prospective placement in a parentally-selected nonpublic school is far less predictable and does not assure the presence of the same familiar mechanisms under which public school districts are required to operate. Once a prospective placement in a nonpublic school (a third party) is effectuated pursuant to an order of an administrative hearing officer, to me it becomes very unclear how a district should proceed to support a student going forward especially if the procedural protections of the IDEA— that is IEP development and placement selection process—has been circumvented and the cart is placed before the horse because the student has already been placed beyond the reach of the school district with a third party before ink has been put to paper in drafting a proposed IEP. These concerns simply do not arise in the same way in retrospective, unilateral placement cases in which the public school district's responsibly to assess the student and continue to propose an appropriate public school placement continues uninterrupted and there is only a deviation in the delivery of services that changes while the student is unilaterally placed at the parent's own risk.

Here, by the time the IHO issued his decision in April 2020, two school years at issue (2017-18 and 2018-19) had already passed and the 2019-20 school year was more than three-quarters of the way through and effectively over, due to the coronavirus (covid-19) pandemic

---

stated that it had "no position" at that time (Tr. pp. 176-77). The parents requested placement at Gersh in two of their due process complaint notices (see IHO Ex. II at pp. 2, 7; III at pp. 2, 7-8). Although, these requests were regarding the 2019-20 school year, the parents clearly indicated their desire to have the student moved to Gersh at district expense.

forcing the closure of schools. Accordingly, although the parents requested placement of the student at Gersh for the 2019-20 school year, based on a denial of FAPE for the 2019-20 school year the IHO awarded prospective placement for the next school year, the 2020-21 school year (see IHO Decision at pp.8, 12, 16; Parents Post Hr'g Brief at p. 2). Again, as noted above, the district does not appeal or cross-appeal from the IHO's decision regarding FAPE and concedes that an award of placement at Gersh for the 2019-20 school year would have been an appropriate award (Answer with Cross-Appeal ¶¶14, 20-21).[36]

Having discussed the pitfalls in awarding prospective relief, I do not lightly issue directives that have the effect of prospectively curtailing the flexible process used by CSEs for placing a student with a disability in an educational setting as envisioned by Congress. In my view, one of the best features of the IDEA for students with disabilities is its flexible, continuously available, individualized planning approach tailored to each student with a disability as well as the wide variety of procedural protections in place to safeguard a student's rights (i.e. mediation, State administrative complaints, due process). There is less risk of causing educational harm to a student when imposing a tuition remedy for a placement that has already occurred and therefore is more easily assessed. My concern is that imposing rigid, long-term prospective relief through due process, even assuming on good authority that it is permissible,[37] leaves behind the best features envisioned by Congress and may backfire and may cause the student as much or more harm than the violation(s) it was intended to remediate.

Turning to the available facts in this case, according to the parent, prior to the close of the impartial hearing, the student had been accepted to Gersh and a seat was available for him as of April 1, 2020 (Tr. p. 241; see also Parent Ex. AA).[38] Gersh is a non-public day school and is not

---

[36] Although it is unclear whether an award of prospective placement in a nonpublic school as a compensatory education award for a fixed period of time would form the basis for a student's pendency placement in a subsequent dispute, if I were to modify the IHO's decision to reflect what the parent had requested during the hearing, immediate placement of the student at Gersh, such an award would constitute the student's pendency placement during a subsequent dispute for the next school year. Once a pendency placement has been established, it can be changed: (1) by agreement between the parties; (2) by an unappealed IHO or court decision in favor of the parents; or (3) by an SRO decision that a unilateral parental placement is appropriate (34 CFR 300.518[a], [d]; 8 NYCRR 200.5[m][1], [2]; see Ventura de Paulino, 959 F.3d at 532; Bd. of Educ. of Pawling Cent. Sch. Dist. v. Schutz, 290 F.3d 476, 483-84 [2d Cir. 2002]; New York City Dep't of Educ. v. S.S., 2010 WL 983719, at *1 [S.D.N.Y. Mar. 17, 2010]; Student X, 2008 WL 4890440, at *23; Arlington Cent. Sch. Dist. v. L.P., 421 F. Supp. 2d 692, 697 [S.D.N.Y. 2006]; Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ., 86 F. Supp. 2d 354, 366 [S.D.N.Y. 2000], aff'd, 297 F.3d 195 [2d Cir. 2002]; Letter to Hampden, 49 IDELR 197 [OSEP 2012]).

[37] The Second Circuit has indicated that there is a "broad spectrum of equitable relief contemplated under the IDEA" when considering a prospective payment versus a retroactive reimbursement remedy (E.M. v. New York City Dep't of Educ., 758 F.3d 442, 453 [2d Cir. 2014]).

[38] The district at no point during the impartial hearing attempted to assert that the program at Gersh was not appropriate for academic reasons and never contested the cost of the program. For the district to raise these issues upon appeal is disingenuous. The district should have defended itself at the hearing. Most notably, the district did not appeal the IHO's finding that the academic program at Gersh was appropriate. In fact, the district acknowledged that the IHO's decision was "well reasoned, supported by the record and was largely correct and appropriate" (Answer with Cross at p. 7).

24

approved by the Commissioner of Education as a school with which school districts may contract for the instruction of students with disabilities (see NYCRR 200.1[d], 200.7).[39]

The record was not developed about other schools the parents sought; however, the district offered the student placement at AHRC. This placement was found by the parents and the IHO to be inappropriate (IHO Decision at p. 12).

In an effort to ensure that the hearing record was complete with regard to evidence relevant to a prospective award of tuition reimbursement, the Office of State Review, at my direction, wrote to the parties on July 8, 2020 directing the submission of additional evidence and offered the parties an opportunity to be heard regarding whether the requested evidence should be considered (see 8 NYCRR 279.10[b] [permitting a State Review Officer to seek additional evidence if he or she determines that such additional evidence is necessary]). Specifically, the district was directed to submit evidence as to whether it conducted a CSE meeting for the student for the 2020-21 school year, and if so, to provide a copy of the IEP, and the parties were directed to provide information as to whether a seat was available for the student at Gersh for the 2020-21 school year. The parents replied on July 10, 2020 indicating that the student entered and now studies at Gersh and, as such, there is a seat available for the student.[40] The district submitted a letter dated July 13, 2020 and attached an IEP dated June 30, 2020.[41] The June 30, 2020 CSE recommended a 12-month 8:1+2 special class in an approved non-public school with related services of one 30-minute session of individual OT per week, one 30-minute session of group OT per week, four 30-minute sessions of individual speech-language therapy, one 30-minute session of group speech-language therapy, and parent counseling and training. Notably, the district did not indicate whether it provided the parents with a school location for the proposed placement.

The June 2020 IEP provided a different educational placement than the one that the IHO held was appropriate for the student; however, it did not indicate that it actually provided the student with a school location for the proposed placement. Due to the district's failures in this matter, and in particular, the district's failure to convene a CSE or create an IEP for the 2017-18 or 2018-19 school years; the district has not earned the benefit of the doubt that it actually located a school placement for the student for the 2020-21 school year. As such, the only actual placement before me available to the student for the 2020-21 school year is Gersh. Additionally, the IHO determined that placement at Gersh was appropriate, which included a 6:1+1 special class with a 1:1 paraprofessional (Tr. pp. 227-28; Parent Ex. AA). The hearing record, which was completed just a few months before the June 30, 2020 CSE meeting supported the IHO's findings that the district failed to offer the student a FAPE and that Gersh was an appropriate placement and the

---

[39] Authorities differ on whether a private school placement that is "unapproved" by State educational authorities is a permissible form of relief (Connors v. Mills, 34 F. Supp. 2d 795, 805 [N.D.N.Y. 1998] [noting that when a child's access to a free and appropriate public education in a substantive sense conflicts with the state's approval process, Carter instructs that the state's approval process must give way].

[40] Further, the parent attached a copy of the due process complaint notice dated July 9, 2020 challenging the IEP dated June 30, 2020.

[41] The district's letter provided that it had not received a due process complaint notice yet; however, the district did receive the parents' ten-day notice letter.

district failed to present any evidence to contradict the IHO's findings. Therefore, although I acknowledge that prospective placements are not ideal, in this instance, I will not disturb the IHO's final determination that placement at Gersh was warranted for the 2020-21 school year as compensatory education. The district is directed to prospectively place the student at Gersh for the 2020-21 school year, unless the parties shall otherwise mutually agree to a different educational setting in writing. Independent of any statutory requirement, the CSE must reconvene by June 1, 2021 to conduct a review of the student's progress at Gersh and, if necessary, revise the educational placement for the period following June 30, 2021 in accordance with federal and State law. To be clear, I view this as an election of remedies by the parents as to the student's educational placement, subject only to further modification in judicial review, and the parents have now assumed the risk that unforeseen future events could render the relief undesirable. This means that the parents cannot later return to the due process hearing system to allege new faults by the district in terms of placement in order to pursue further relief inconsistent with an educational placement at Gersh as they requested for the 2020-21 school year in this matter. The only option for further modification would be to reach a mutual agreement with the district to place the student in another setting for the time period covered by this decision.

## VII. Conclusion

Based on the private evaluative reports produced by the parents and the lack of counter-evidence from the district regarding the student's needs, the hearing record supports the parents' request for 20 hours per week of 1:1 home-based ABA services as well as placement of the student at Gersh for the 2020-21 school year and the district is directed to provide for those services. However, the parent's request for 40 hours per year of home-based speech-language services at district expense is not supported by the hearing record and is denied.

**THE APPEAL IS SUSTAINED TO THE EXTENT INDICATED.**

**THE CROSS APPEAL IS DISMISSED.**

**IT IS ORDERED** that the IHO's decision dated April 20, 2020 is hereby modified, to the extent that in addition to the relief awarded by the IHO, the district shall fund 20 hours per week of home-based ABA services for the 2020-21 school year.

Dated:    Albany, New York
          July 2 9, 2020

STEVEN KROLAK
STATE REVIEW OFFICER

26